## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

ZOHAR WAGNER,

              Plaintiff,

    v.

SAINT JOSEPH'S/CANDLER HEALTH
SYSTEM, INC.,

        Defendant.

CIVIL ACTION NO.: 4:20-cv-284

## **O R D E R**

      Presently before the Court is Defendant Saint Joseph's/Candler Health System, Inc.'s (the "Hospital") Motion for Summary Judgment. (Doc. 24.) This case arises from the Hospital's decision to deny a request by Plaintiff Wagner, a member of the Orthodox Jewish faith, to take seven days off work to observe certain Jewish holidays which fell during October 2019. (Doc. 1.) After Plaintiff missed four days of work to observe those holidays without permission, the Hospital terminated her. (Id. at p. 6.) Wagner then sued the Hospital alleging that it failed to accommodate her and terminated her because of her religious observance and her need for religious accommodations in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2. (See id. at pp. 7–8.) The Hospital filed the at-issue Motion for Summary Judgment, arguing that it could not accommodate Wagner's request without undue hardship and that it terminated her for insubordination and missing work, not because of her Jewish faith. (Docs. 24, 25.) The issues have been fully briefed. (See docs. 25, 28, 30, 31, 32, 35.) For the reasons stated below, the Court **GRANTS** the Hospital's Motion for Summary Judgment. (Doc. 24.)

## BACKGROUND

I.    **Factual History**

A.    **Wagner's Orthodox Jewish Faith**

Plaintiff Zohar Wagner is an Orthodox Jew who observes Jewish High Holidays and weekly Shabbat.  (Doc. 33, p. 1; doc. 24-3, p. 7.)  Jewish High Holidays include: (1) Passover, which occurs over four days in March or April; (2) Shavuot, which occurs over two days in May or June, and (3) Rosh Hashanah, Yom Kippur, and Sukkot, which occur over seven days in September and October (the "October High Holidays").  (Doc. 33, p. 2; doc. 24-3, p. 8.)  During weekly Shabbat and the thirteen days on which High Holidays fall, Wagner's faith prohibits her from working or doing weekday activities, such as cooking, driving, or using electronics.  (Doc. 33, pp. 1–2; doc. 24-3, pp. 8–9.)  According to Wagner, her faith requires her to observe all High Holidays.  (Doc. 33, p. 2; doc. 24-3, p. 8; see also doc. 32-8, p. 3.)

B.    **Wagner's Employment and Job Duties at the Hospital**

On July 10, 2017, Wagner began her employment at the Hospital as an Admissions Notification Specialist ("ANS") in the Clinical Care Coordination Department (the "Department").  (Doc. 33, p. 2; doc. 24-3, pp. 3–4.)  Wagner was interviewed and hired by Dee Dee Seagraves, the director of the Department.  (Doc. 33, p. 2; doc. 24-3, p. 6.)  As an ANS, Wagner notified insurance companies about patient admissions for inpatient stays and submitted pre-certifications.  (Doc. 33, p. 3; doc. 24-3, pp. 4–5, 19.)  The ANS role requires "specific knowledge" of insurance information and is time-sensitive; if the Hospital does not notify an insurance company that its insured has been admitted for an inpatient stay at the Hospital within twenty-four hours, the Hospital receives a fine, is not paid, or must file an appeal.  (Doc. 33, pp. 3–4; doc. 24-3, pp. 19–20.)  Seagraves testified that Wagner's job was "financially vital,"

"crucial in the financial cascade of events that occurs," and must be done daily to avoid financial loss to the Hospital.  (Doc. 33, pp. 4, 15; doc. 24-2, pp. 12, 15.)  Indeed, Wagner acknowledged that ensuring the Hospital gets paid is "critical" and that there were ramifications for not meeting notification deadlines.  (Doc. 33, pp. 4–5; doc. 24-3, p. 23.)  However, Seagraves stated that, as the director of the Department, she was "responsible for all of the admission notifications to the insurance payers [sic]."  (Doc. 32-2, pp. 10–11.)

Wagner's daily responsibilities included completing the daily admissions worklist, which required her to run notification of admissions in the morning and afternoon, addressing emails from the utilization management nurses for notices, notifying payors of status changes, and "mother/baby notifications."  (Doc. 33, p. 5; doc. 24-4, p. 2.)  Seagraves testified that working on the daily admissions worklist encompassed ninety percent of Wagner's job responsibilities.  (Doc. 24-2, p. 9.)  Wagner's job was 40 hours a week, although her workload varied depending on the number of patients in the hospital.  (Doc. 33, p. 6; doc. 24-3, p. 15.)  Wagner's normal working hours were 8:00 a.m. to 4:30 p.m., Monday through Friday, though she occasionally worked Sundays.  (Doc. 33, pp. 5–6; doc. 24-3, p. 25.)

In August 2018, the Hospital restructured the Department to implement a business support unit (the "Unit").  (Doc. 33, pp. 6–7; doc. 24-2, p. 15.)  The Unit consisted of a team of four individuals and a full-time manager, Heather Woodward.  (Doc. 33, p. 7; doc. 24-3, p. 15.)  Wagner was a part of the Unit along with Katie Eichelbaum, Anne Hart, and Octavia Shelman, all of whom verified insurance.  (Doc. 33, p. 7; doc. 24-2, pp. 15, 17; doc. 24-3, pp. 5, 16, 39–40.)  Eichelbaum, who was a friend of Wagner's before she started at the Hospital, was also Jewish.  (Doc. 24-3, pp. 5–6.)  Wagner testified that, although she was the only person who worked full time on notifications, (doc. 24-3, pp. 21–22), Eichelbaum, Woodward, Seagraves, and two other women, Nancy Hardee and Hollie Patterson, knew how to do her job, (id. at pp.

3

12–16, 22, 26; <u>see</u> doc. 33, p. 16; doc, 24-2, pp. 10, 18).  Patterson split her time between (1) working as clerical support for case managers at the Hospital on weekends, and (2) mother/baby admission notifications for both the St. Joseph's campus and the Candler campus[1] on Mondays and Tuesdays.[2]  (Doc. 33, p. 8; doc. 24-3, pp. 13–14, 42.)  However, Seagraves testified that Patterson only knew how to do mother/baby notifications, which are "very different from medical notifications" and "a very small portion of Ms. Wagner's job."  (Doc. 33, pp. 8–9; doc. 24-2, p. 7.)  Furthermore, Seagraves testified that Woodward "is only able to do a small portion of [Wagner's] work."  (Doc. 24-2, p. 11.)

### C.     Performance of Wagner's Job Duties When She was Absent from Work

Both Seagraves and Woodward were responsible for the schedule and ensuring there was coverage for each team.  (Doc. 33, p. 10; doc. 24-3, pp. 18–19.)  When Wagner was absent, Seagraves, Woodward, Patterson, and Hardee performed some of her job duties.[3]  (Doc. 33, pp. 12–13.)  Wagner admits that Seagraves, Woodward, Patterson, and Hardee had their own demanding full-time jobs and that their primary roles were not to do her job. (Doc. 33, p. 13; doc. 24-3, pp. 16, 26, 43–44.)  Wagner also acknowledges that untrained persons should not

---

[1]  The Hospital consists of two hospitals on separate campuses, the St. Joseph's Hospital ("St. Joseph's") and the Candler Hospital ("Candler").  (<u>See</u> doc. 33, p. 15; <u>see also</u> doc. 24-2, p. 9.)

[2]  Patterson performed mother/baby notifications on Mondays and Tuesdays because on Mondays the Department must process the three prior days of admissions (Friday, Saturday, and Sunday), and on Tuesdays the Department must process the prior day's notifications, which are typically numerous because many elective cases for induction and Cesarean sections are performed on Mondays.  (Doc. 24-2, pp. 6–7.)

[3]  In April 2019, Wagner received a Disciplinary Action Report ("DAR") after she left work early with the expectation that she would return before the end of the day but failed to do so.  (Doc. 33, p. 11; doc. 24-6, pp. 2–3; doc. 32-1, p. 111.)  Wagner did not notify anyone that she did not return to work until she texted Seagraves the following morning.  (Doc. 33, p. 11; doc. 24-6, p. 3; doc. 32-1, p. 111.)  The DAR advised Wagner that her failure to "ensure or arrange to have her workload completed by the end of the day . . . resulted in [Woodward], [Seagraves], and coworkers completing her work to ensure [the Hospital] [did] not receive denials resulting in lost revenue."  (Doc. 33, p. 11; doc. 24-6, p. 2; doc. 32-1, p. 11.)

perform admission notifications.  (Doc. 33, p. 14; doc. 24-3, p. 41.)  If Wagner took a planned absence, Seagraves would evaluate the calendar and decide who would cover the absence.  (Doc. 33, p. 14; doc. 24-2, pp. 4–5.)  If Wagner's absence was unplanned, Seagraves and Woodward would evaluate their schedules and responsibilities for the day, consider—based on whether it was a Monday or Tuesday—whether Patterson was working and could help, and then determine the best option to accomplish the work.  (Doc. 33, p. 14; doc. 24-2, p. 8.)  Depending on her own and Woodward's schedules, Seagraves would sometimes have to arrange for additional help to work overtime or on an extra day to try and cover the absence.  (Doc. 33, pp. 14–15; doc. 24-2, pp. 5, 11.)  Typically, Seagraves and Woodward would perform Wagner's status changes and complete the daily admission work list while Wagner was absent.  (Doc. 33, p. 15.)

### D.     PTO for Jewish High Holidays and the Hospital's Denial of Wagner's Request to Miss Seven Days of Work to Observe the October High Holidays

Paid Time Off ("PTO") requests were submitted electronically, and employees did not need to state a reason for their requests.  (Doc. 33, p. 9; doc. 24-2, p. 14.)  Approval of PTO is at the discretion of the manager, although Seagraves was also involved in the process.   (Doc. 33, p. 9; see doc. 24-2, pp. 21–22; see also doc. 24-3, p. 18.)  In evaluating whether to approve a PTO request, managers evaluate the needs of their particular business unit, the requesting employee's past, present, and future PTO availability, and PTO requests made by other team members. (Doc. 33, p. 10.)  Seagraves testified that approval of PTO requests was based on whether the Department was able to operate and accommodate the request.  (Id.; doc. 32-2, pp. 42–43.)

In 2018 and early 2019, Seagraves permitted Wagner to take off all Jewish holidays, including the High Holidays in April 2019.  (Doc. 33, p. 17; doc. 24-2, pp. 19–20; doc. 24-3, p. 36.)  The parties agree that when Eichelbaum and Wagner were off at the same time in April 2019, Seagraves realized that their simultaneous leave created a hardship on the Department.

(Doc. 33, p. 17; see doc. 24-2, pp. 19–20.)  Seagraves decided that she needed to discuss the Jewish holidays with Wagner and Eichelbaum, since—following the creation of the Unit in August 2018—there were now two people on a four-person team who observed Jewish holidays. (Doc. 33, p. 17; doc. 24-2, pp. 19–20.)  On April 17, 2019, Seagraves emailed Wagner and Eichelbaum stating, "We would like to meet with the two of you to discuss your holidays and develop a plan.  Please put together a complete list of your holidays and then we will schedule a meeting.  Please keep in mind that this department is considered essential personnel for the organization."  (Doc. 33, p. 18; doc. 24-9, p. 2.)  Eichelbaum responded with dates, and, in an email to which Wagner was courtesy copied, Seagraves requested more information, including "an explanation for each holiday, what is expected of you and[,] considering your essential personal responsibilities[,] [whether] you [can] be excused from any of the dates."  (Doc. 33, p. 18; doc. 32-1, p. 148; doc. 24-11, pp. 2–3.)  Wagner and Eichelbaum indicated that they wanted seven workdays off between September 30 and October 22, 2019, to attend all the October High Holidays.  (Doc. 33, pp. 18–19; doc. 24-3, pp. 34–35.)  This equated to fourteen workdays in a seventeen-workday period that other team members, Seagraves, and Woodward would have to absorb in addition to their own full-time responsibilities.  (Doc. 33, p. 19, doc. 24-2, p. 24.)

Seagraves and Woodward met multiple times between April and August 2019 to determine whether the Hospital could accommodate Wagner and Eichelbaum's religious holidays.  (Doc. 33, p. 19; doc. 24-2, pp. 33–34.)  Seagraves testified that she also spent extra time and energy looking into the specific dates requested, including reviewing the Department's, Woodward's, and her own schedules.  (Doc. 33, p. 19; doc. 24-2, pp. 24–25, 37.)  Seagraves also indicated that she considered the anticipated workload, current staffing, her own and Woodward's full-time responsibilities, the number of days Wagner and Eichelbaum were requesting, and Wagner's unique skill set.  (Doc. 33, pp. 19–20; doc. 24-2, pp. 34–35.)  When

asked during her deposition whether she could project the "current workload for October," Seagraves said

> I can—based on *historical data*, I know what periods of time are going to look like with workload. And knowing that, I can't allow anyone else to be off, I can't take off, the manager can't take off. What if we get sick? You know, there's no one to do the job; I'm going to have to be there no matter what working long hours, paying overtime. That's what goes into the decision.

(Doc. 32-2, pp. 64–65 (emphasis added).) When asked whether there was a "specific metric, . . . graph, [or] a piece of data that [she] looked at" when determining whether the anticipated workload would be "too great for [her] staff to handle," Seagraves stated that "there was no data." (Id. at p. 65.)

Ultimately, Seagraves and Woodward concluded that they could not alter their schedules to ensure they could perform the "vital function" of Wagner's duties for the seven days in light of the Department's anticipated workload, nor could the Hospital afford the financial loss of failing to complete Wagner's duties. (Doc. 33, p. 20; doc. 24-2, pp. 25, 37.) Moreover, Seagraves determined that granting both Eichelbaum and Wagner all seven days off would require other employees to complete, in essence, two more full-time jobs during that time period. (Doc. 33, pp. 20–21; doc. 24-2, pp. 24–25.) Therefore, Seagraves decided to allow them each to take off three days of their choosing during the seventeen-workday period to observe the October High Holidays. (Doc. 33, pp. 21–22; doc. 24-2, p. 36.)

In August 2019, Seagraves met with Wagner and Eichelbaum to inform them of her decision to accommodate only three days off instead of their desired seven. (Doc. 33, p. 22; doc. 32-2, p. 74.) Seagraves memorialized this meeting in an e-mail to Wagner dated August 20, 2019, which states, in relevant part, "Based on our current workload and staffing, granting seven days off during that . . . period would impose an undue hardship on the [D]epartment." (Doc. 24-12, p. 3; see doc. 33, pp. 22–23.) Indeed, Wagner admitted that granting all seven days would

have required Hardee, Patterson, Seagraves, and Woodward to bear an additional workload to cover for her, which would have taken them away from their own jobs.  (Doc. 33, p. 21; doc. 24-3, p. 45.)

>    **E.    Wagner is Terminated After She Misses Four Days of Work to Observe the October High Holidays**

Wagner did not file a complaint or grievance about Seagraves's denial of her request and testified that she understood she was only approved to take three days off to observe the October High Holidays.  (Doc. 33, p. 23; doc. 24-3, p. 61.)   Wagner submitted PTO requests for September 30, October 1, and October 9, and Seagraves approved all three.  (Doc. 33, p. 23; doc. 24-2, p. 59.)  However, Wagner did not report to work on October 14, 15, 21, or 22. (Doc. 33, p. 23; doc. 24-2, p. 52.)  On October 13 (the Sunday before Wagner's shift on October 14), Wagner texted Seagraves to inform her that she could not work on October 14 or 15 and offered to come in to work a few hours that Sunday (October 13).  (Doc. 33, pp. 23–24; doc. 24-3, pp. 48–49; doc. 32-8, p. 2.)  When Seagraves asked her to explain, Wagner responded, "You won't . . . approve all [PTO] for Jewish holidays[,] . . . I can't not [sic] and will not break my faith[,] and I can't work, drive, or use electronics!  . . .  I care about my job[,] but I can't break my obligations that I grew up [on] all my life."  (Doc. 32-8, p. 3.)  Seagraves responded that the issue had already been addressed and that she expected Wagner at work.  (Id.; doc. 33, p. 24.)  Wagner then stated, "This was addressed your way without any consideration.  I can't be in, I want to[,] but I can't."  (Doc. 24-14, p. 4.)  Wagner testified that "there was no consideration" because she was not granted her request to use PTO to observe all October High Holidays.  (Doc. 33, p. 24; doc. 24-3, p. 63.)

Seagraves testified that, because of Wagner's absence, she had to "drop everything [she] was doing and perform [Wagner's] job."  (Doc. 33, p. 25; doc. 24-2, pp. 25–26.)  Seagraves

divided Wagner's duties between herself, Woodward, and Patterson, with Patterson completing the mother/baby notifications.   (Doc. 33, p. 25; doc. 24-2, p. 26.)  Seagraves estimates that on the days Wagner was absent, she spent nearly twelve hours each day to complete both her and Wagner's duties.  (Doc. 33, pp. 25–26; doc. 24-2, pp. 25–26.)  Seagraves stated that she missed many things on her schedule and did not return phone calls or attend meetings.  (Doc. 33, pp. 25–26; doc. 24-2, pp. 25–26.)  Additionally, Seagraves testified that "[e]very employee that [sic] had to help" complete Wagner's work, including Hardee, complained about Wagner's absence. (Doc. 33, p. 26; doc. 24-2, pp. 25–26.)  However, Seagraves admits that there was no resulting financial impact on the Hospital because all of Wagner's work was ultimately completed.  (Doc. 24-2, pp. 26–27.)

Seagraves terminated Wagner on October 30, 2019.  (Doc. 33, p. 26; doc. 24-3, p. 4.) The DAR for Wagner's termination states that she was terminated for "insubordination;" specifically, failing "to work on 4 scheduled days as instructed."  (Doc. 33, p. 26; doc. 24-13, p. 2.)

## II.   Procedural History

On November 12, 2020, Wagner sued the Hospital alleging that it discriminated against her on the basis of her religion in violation of Title VII.  (Doc. 1.)  Wagner alleges two theories of recovery under Title VII: (1) failure to accommodate and (2) wrongful termination.  (See doc. 1, p. 7; see also doc. 32, p. 2 n.2.)  Specifically, the Complaint states that the Hospital "fail[ed] to accommodate [Wagner] and terminated her employment because of her religion practices and/or need for a religious accommodation."  (Doc. 1, p. 7.)  The parties conducted discovery, and, thereafter, the Hospital filed the at-issue Motion for Summary Judgment, (doc. 24), and

supporting brief, (doc. 25).  Wagner filed a Response to the Hospital's Motion for Summary Judgment, (doc. 31), and supporting brief, (doc. 32).[4]  The Hospital filed a Reply.   (Doc. 35.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

---

[4]  After the Hospital filed its Motion for Summary Judgment, Wagner filed an "Opposed Motion for Deferment," arguing that the Court should grant her 60 days to engage in additional discovery to allow her to properly respond to the Hospital's Motion for Summary Judgment.  (Doc. 28.)  On September 3, 2021, Wagner filed a Notice to inform the Court that, "[i]n light of additional information received by Plaintiff and upon agreement with Defendant" during a discovery hearing before the Magistrate Judge, she was withdrawing her motion for deferment.  (Doc. 40, p. 1.)  Therefore, consistent with the Notice, the Court **DISMISSES** Plaintiff Wagner's Opposed Motion for Deferment.  (Doc. 28.)

pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). Accordingly, in considering the Hospital's Motion for Summary Judgment, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to Wagner.

## DISCUSSION

**I.     Wagner's Wrongful Termination Claim under Title VII**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In Title VII cases (such as this one) where the plaintiff does not present direct evidence of discrimination, courts apply the burden-shifting approach articulated by the Supreme Court of the United States in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).[5] See Peavley v. Chase Home Fin., No. 1:11-cv-368-WKW, 2012 WL 5966560, at *6 (M.D. Ala. Aug. 31, 2012) ("Because the Peavleys have not presented direct evidence . . . of discrimination, the court proceeds to evaluate their circumstantial evidence of disability discrimination under the McDonnell Douglas test."); see also Crawford v. Carroll, 529

---

[5]  Wagner has not pointed to any direct evidence of discriminatory intent nor has she argued that any exists. (See generally doc. 32.)

F.3d 961, 975–76 (11th Cir. 2008).   Under the <u>McDonnell Douglas</u> framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  <u>Crawford</u>, 529 F.3d at 975–76.   In order to do so, the plaintiff must show, *inter alia*, that "his employer treated similarly-situated employees outside his class more favorably or replaced him with someone outside his class." <u>MackMuhammad v. Cagle's, Inc.</u>, 379 F. App'x 801, 804 (11th Cir. 2010) (citing <u>Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.</u>, 342 F.3d 1281, 1289 (11th Cir. 2003)); <u>see</u> <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1541 (11th Cir. 1989) (noting that the burden is on the plaintiff "to show a similarity between [his] conduct and that of [potential comparators] and not on [the defendant] to disprove their similarity.") (internal quotations omitted).   "Once the plaintiff has made out the elements of the *prima facie* case, the employer must articulate a non-discriminatory basis for its employment action.   If non-discriminatory reasons are identified, the plaintiff must then show that the proffered reasons were pretextual." <u>MackMuhammad</u>, 379 F. App'x at 804 (citing <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999)).

The Hospital argues that it is entitled to summary judgment because Wagner failed to establish a *prima facie* case of wrongful termination.  (<u>See</u> doc. 25, pp. 19–21.)  Specifically, the Hospital argues that Wagner failed to "put forth evidence of a non-Jewish individual who was treated more favorably than her with respect to her adverse employment action."  (<u>Id.</u> at p. 19.) The Hospital further contends that Anne Hart, Wagner's chosen comparator, (doc. 33, p. 28), was not similarly situated to Wagner, and, therefore, is an improper comparator.  (<u>See id.</u> at pp. 20–21.)  Additionally, the Hospital argues that, even assuming Wagner has established a *prima facie* case, the Hospital has provided a non-discriminatory basis for its decision to terminate her and she cannot demonstrate that the proffered reason for terminating her was pretextual.  (<u>Id.</u> at pp. 21–24.)

12

Although Wagner references her termination claim in a footnote in her Response, (see doc. 32, p. 2 n.2), she does not respond to any of the Hospital's arguments with respect thereto, (see generally doc. 32).   Instead, Wagner focuses exclusively on rebutting the Hospital's argument that it could not accommodate her without undue hardship.[6]   (See generally id); see Discussion Section II, infra.   The only conceivable support Wagner provides to establish her prima facie case is her statement that the Hospital "allowed for another employee in Wagner's department, Anne Hart[], to utilize PTO . . . in 2019, much of it for travel."  (Doc. 32, p. 7.) However, this lone reference to Hart—who is undisputedly the only comparator Wagner relies upon—is nowhere near sufficient to show that she is a similarly-situated comparator.  (Doc. 33, p. 28.)  The Eleventh Circuit Court of Appeals has clarified that "a plaintiff proceeding under McDonnell Douglas must show that she and her comparator[] are 'similarly situated in all material respects.'"  Lewis v. City of Union City, 918 F.3d 1213, 1226 (11th Cir. 2019).  Under the "all-material-respects" standard, a similarly-situated comparator must have, inter alia, "engaged in the same basic conduct (or misconduct) as the plaintiff."  Lanier v. Sizemore, Inc., No. 6:18-cv-003, 2021 WL 4432830, at *4 (S.D. Ga. Sept. 27, 2021) (quoting Lewis, 918 F.3d at 1227); see Thomas v. Dep't of Corr. for Ga., 377 F. App'x 873, 880 (11th Cir. 2010) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed.") (citing Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir. 2008)).   Here, Wagner has failed to point to any

---

[6]  As the Hospital points out, there is some authority which suggests this Court could grant summary judgment in the Hospital's favor solely because Wagner failed to respond to its arguments.  See, e.g., Brewer v. Purvis, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993) ("Summary judgment is appropriate since Plaintiff failed to respond to CCSD's argument on this issue."); (see doc. 35, p. 18.)  However, because Wagner referenced her wrongful termination claim and mentioned Hart (her proposed comparator) in her Response, (doc. 32, p. 2 n.2), the Court, out of an abundance of caution, declines to treat Wagner's wrongful termination claim as waived and proceeds, as it ordinarily would, to determine whether Wagner has produced sufficient evidence to support her claim.

evidence that she and Hart engaged in the same basic misconduct and, thereafter, were disciplined differently, or that they share any other characteristics which suggest they are similarly situated.  (See generally doc. 32.)  Indeed, as the Hospital aptly puts, Wagner "did not bring a claim for disparate distribution of PTO days, but for [wrongful] termination," and "there is no evidence [that] Hart, or any other non-Jewish employee, was scheduled to work, failed to report to work on four [or more] occasions after being instructed to report to work, and was not fired."  (Doc. 25, pp. 20–21.)  Therefore, since she failed to show that Hart is a similarly situated comparator, Wagner has not made out a prima facie case of wrongful termination.  McQueen v. Wells Fargo, 573 F. App'x 836, 838 (11th Cir. 2014) (finding that plaintiff failed to establish a prima facie case where "the only coworker that [she] identified as a potential comparator did not violate Wells Fargo's employee policy by altering a mortgage loan document following second-level review without authorization, as [she] did"); Lanier, 2021 WL 4432830, at *5 ("Lanier has failed to present any evidence Sizemore treated [a] similarly situated employee[] outside [his] class more favorably.  As such, he has failed to make out his *prima facie* case of discrimination under Title VII.") (internal quotations and citations omitted).

Moreover, Wagner did not argue, much less present any evidence suggesting, that the Hospital's stated reason for firing her—"[i]nsubordination for fail[ing] to work on four scheduled days as instructed," (doc. 24-13)—was pretextual.  (See doc. 32); see also Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.").  To the contrary, Wagner testified, "Seagraves . . . terminat[ed] me for not coming in to work when I had to observe a Jewish Holiday."  (Doc. 32-1, p. 115.)

Thus, because Wagner failed to make out a *prima facie* case of wrongful termination and presented no evidence to show the Hospital's legitimate, non-discriminatory reason for firing her was pretextual, the Hospital is entitled to summary judgment with respect to the wrongful termination claim in Count I.

## II.     Wagner's Failure to Accommodate Claim under Title VII

Wagner's failure to accommodate claim is based on the Hospital's refusal to allow her to observe all of the October High Holidays.  (See doc. 1, p. 5; see also doc. 24-3, p. 35 (stating that her failure to accommodate claim was based on not being allowed to observe "all of the Jewish holidays in October").)  Indeed, Wagner indicated that "[t]he only accommodation that would satisfy [her] was to be given time off for all of her religious holidays."  (Doc. 33, p. 27.)

Religious accommodation claims under Title VII are subject to a two-step burden-shifting framework.  Walden v. Ctrs. for Disease Control & Prevention, 669 F.3d 1277, 1293 (11th Cir. 2012).  First, the plaintiff must establish a *prima facie* case of intentional discrimination by presenting evidence sufficient to prove that she (1) "had a bona fide religious belief that conflicted with an employment requirement"; (2) "informed [her] employer of [her] belief"; and (3) "was discharged for failing to comply with the conflicting employment requirement."  Id.  If the plaintiff makes out a *prima facie* case, then "the burden shifts to the defendant to 'demonstrate[] that [it] is unable to reasonably accommodate . . . [the] employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.'"  Id. (quoting Morrissette–Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1321 (11th Cir. 2007)); see also 42 U.S.C. § 2000e(j) (exempting from Title VII's definition of "religion"—and, therefore, from the protections of Title VII—"all aspects of religious

observance and practice" which an employer "is unable to reasonably accommodate . . . without undue hardship on the conduct of the employer's business").

The terms "reasonable accommodation" and "undue hardship" are not defined in Title VII. Beadle v. Hillsborough Cty. Sheriff's Dep't., 29 F.3d 589, 592 (11th Cir. 1994). However, "the [United States] Supreme Court has explained that a reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices.'" Morrissette-Brown, 506 F.3d at 1322 (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986)). Furthermore, "[t]he Supreme Court has described 'undue hardship' as any act requiring an employer to bear more than a 'de minimis cost' in accommodating an employee's religious beliefs." Beadle v. City of Tampa, 42 F.3d 633, 636 (11th Cir. 1995) (quoting Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 n.15 (1977)). "De minimis cost" entails monetary concerns, the employer's burden in conducting its business, and unequal treatment of other employees. Hellinger v. Eckerd Corp., 67 F. Supp. 2d 1359, 1364 (S.D. Fla. 1999) (citing Beadle v. City of Tampa, 42 F.3d at 636; Hardison, 432 U.S. at 84). The determination of whether an accommodation would impose more than a de minimis cost must be made "in light of the employment context of each case." Murphy v. Edge Mem'l Hosp., 550 F. Supp. 1185, 1190 (M.D. Ala. 1982).

For purposes of its Motion, the Hospital concedes that Wagner has made out a *prima facie* failure to accommodate claim under Title VII. (Doc. 25, p. 14.) Nonetheless, the Hospital argues that it is entitled to summary judgment because it could not have reasonably accommodated Wagner's request to take seven days off over a seventeen-workday period without suffering undue hardship.[7] (See id. at pp. 14–19.) As such, "the Court's analysis must

---

[7] The Hospital does not appear to argue that it reasonably accommodated Wagner by allowing her to take off three days of work to observe the October High Holidays. (See generally doc. 25.) To the contrary,

focus on whether [the Hospital] has shown that it would have endured a greater than *de minimis* cost" if it allowed Wagner to miss work to observe all October High Holidays.  Hellinger, 67 F. Supp. 2d at 1364 (citing Philbrook, 479 U.S. at 68–69).

### A. Granting Wagner's Request to Observe all the October High Holidays Would Have Required Seagraves and Wagner's Co-Workers to Perform Wagner's Duties at the Expense of their Own.

The Supreme Court has recognized that replacing an absent employee with supervisory personnel or qualified personnel from other departments may impose an undue hardship because it "involve[s] costs to [an employer]," including "lost efficiency in other jobs."  Hardison, 432 U.S. at 84; Dalberiste v. GLE Assocs., Inc., No. 18-62276-CIV-SMITH, 2020 LEXIS 28214, at *14 (S.D. Fla. Feb. 18, 2020) ("[T]he Supreme Court has made it clear that an accommodation that requires other employees to assume a disproportionate workload . . . is an undue hardship.") (citing Hardison, 432 U.S. at 81). Based on this authority, the Hospital argues that accommodating Wagner's request for seven days off over a seventeen-workday period was an undue hardship because it would have left the Department "significantly short staffed" and "required Seagraves, Woodward, Hardee, and Patterson to incur a significant additional workload in order to perform both their own full-time duties and Wagner's."  (Doc. 25, pp. 15–16.)

The evidence shows that, due to the unique nature of Wagner's job, accommodating her request would have required her supervisors and fellow employees (all of whom had their own

---

the Hospital seems to argue that, in light of the fact that Wagner's faith requires her to observe *every* High Holiday and prohibits her from working during the observance of *any* of the High Holidays, (see doc. 33, pp. 1–2; doc. 24-3, pp. 8–9; see also doc. 32-8, p. 3), it could not have reasonably accommodated her without incurring undue hardship. (See doc. 25, p. 14); see Philbrook, 479 U.S. at 70 (describing a "reasonable accommodation" as one that "eliminates the conflict between employment requirements and religious practices"). Thus, this is a case where "the extent of undue hardship on the employer's business is at issue." Id. at 68–69 (noting that undue hardship is relevant "only where the employer claims that it is unable to offer any reasonable accommodation without such hardship").

full-time job duties) to perform Wagner's job for seven days over a seventeen-workday period. The parties agree that Wagner's job was "time-sensitive" and that there were financial ramifications for the Hospital if Wagner (or whoever was performing her job) failed to notify insurance companies of inpatient stays involving one of their insureds within twenty-four hours; namely, the Hospital would get a fine, not be paid, or have to file an appeal.  (Doc. 33, pp. 4–5; doc. 24-3, p. 23.)   Wagner concedes that she is the only Hospital employee who worked on admissions notifications full time and that Seagraves, Woodward, Patterson, and Hardee had their own demanding full-time jobs.   (Doc. 33, pp. 3, 13; doc. 24-3, pp. 16, 21–26, 43.) Seagraves testified that when Wagner took an unplanned absence, she sometimes had to arrange for additional help to work overtime or have an employee work an extra day.  (Doc. 33, pp. 14– 16; doc. 24-2, pp. 5, 11.)   Indeed, Wagner herself stated that, due to the time-sensitive nature of her job duties, Woodward, Seagraves, and her fellow employees had to cover for her when she was absent.  (Doc. 33, pp. 12–13; doc. 24-3, pp. 16, 26, 41–43; doc. 32-1, p. 160.)   Notably, Wagner also concedes that if the Hospital were to have granted her seven days off to observe the October High Holidays, Hardee, Patterson, Seagraves, and Woodward would have had to bear an additional workload, which would have taken them away from their own jobs. (Doc. 33, p. 21; doc. 24-3, p. 45.)  In fact, Seagraves testified that is exactly what occurred when Wagner failed to show up for four shifts in October 2019 to observe the October High Holidays; Seagraves had to "drop everything she was doing" and divide Wagner's duties among Patterson, Woodward, and herself.  (Doc. 33, pp. 25–26; doc. 24-2, pp. 25–26.)

This evidence suggests that the Hospital would have—and ultimately did— endure more than a *de minimis* cost in order to accommodate Wagner's request to miss seven days of work to

observe the October High Holidays.[8]  See, e.g., Howard v. Haverty Furniture Cos., 615 F.2d 203, 206 (5th Cir. 1980) (affirming district court's finding of undue hardship where the evidence showed that "[s]upervisory personnel were required to perform [the] plaintiff's job to the detriment of their regular duties");[9] Murphy, 550 F. Supp. at 1192 (finding that accommodating hospital employee's request not to be scheduled to work on the Sabbath was an undue hardship where: (1) "there could not [have] be[en] a reduction in staff without a consequent decrease in patient care" and (2) "[s]ubstitut[ing] employees from within the existing staff would have required the payment of overtime, a higher wage, or decreased efficiency"); Jean-Pierre v. Naples Cmty. Hosp., Inc., No. 2:18-cv-98-FtM-38MRM, 2019 WL 4737587, at *7 (M.D. Fla. Sept. 27, 2019), aff'd, 817 F. App'x 822 (11th Cir. 2020) ("It was essential to NCH's business to require weekend shifts from its staff.  NCH schedules employees based on patient needs and staff, and it did not have to compromise meeting patients['] demands when understaffing prevented it from continuing to give Jean-Pierre Saturdays off."); Lindsey v. Bridge Rehab, Inc., 369 F. Supp. 3d 1204, 1213 (N.D. Ala. 2019) (granting summary judgment where the employer

---

[8]  Wagner attempts to analogize this case to E.E.O.C. v. Ilona of Hungary, Inc., 108 F.3d 1569 (7th Cir. 1997).  (See doc. 32, pp. 10–11.)  In Ilona, the Seventh Circuit Court of Appeals found that a nail salon failed to prove it would have incurred undue hardship had it accommodated two Jewish employees' request to miss one day of work to observe Yom Kippur.  108 F.3d at 1576–77.  The nail salon argued that it could not afford to allow the employees to take off Yom Kippur—which fell on a Saturday— because the employees were partially booked, and Saturday traditionally was the salon's busiest day of the week.  Id. at 1576–77.  The court relied on the fact that "any inconvenience caused by the [employees'] absences . . . could have been avoided had Ilona rescheduled their appointments in advance."  Id. at 1577.  The case at hand is actually distinguishable from Ilona.  Here, there is no evidence that the work that needed to be performed by Wagner on the seven October High Holidays could simply have been rescheduled, delayed, or redistributed to other employees in advance (in lieu of other work typically assigned to those other employees).  Indeed, Wagner admits that other employees would have to be "taken . . . away from their jobs" (that still would need to be completed) and would have to "bear [an] additional workload" on all of the days she was out if the Hospital accommodated her request. (Doc. 24-3, p. 45.)

[9]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all Fifth Circuit Court of Appeals' decisions issued before October 1, 1981, as binding precedent.

"could not reasonably accommodate the *extent or manner* to which [the plaintiff] wanted to express her faith without [suffering] undue hardship" and "enlarg[ing] its burden in conducting its business") (emphasis added) (internal quotations omitted).

Wagner does not appear to dispute that Seagraves and her co-workers covered for her during her four unexcused absences. (<u>See generally</u> docs. 32, 33.) Nonetheless, she argues that the Hospital "suffered no financial impact during the period in question as all notification tasks were completed by Seagraves." (Doc. 32, p. 11.) It is true that Seagraves testified that all of Wagner's work was ultimately completed and that the Hospital did not suffer any direct financial consequences as a result of Wagner's absences. (Doc. 24-2, pp. 26–27.) However, "the fact that [the Hospital] incurred no direct money cost from [Wagner's] absence is not controlling." <u>Howard</u>, 615 F.2d at 206. As noted above, "undue hardship" entails more than just financial costs; it also includes interference with an employer's ability to conduct its business and unequal treatment of employees. <u>Hellinger</u>, 67 F. Supp. 2d at 1364. Seagraves estimated that on the days Wagner was absent, she ended up working twelve to thirteen-hour days to complete both Wagner's duties and her own responsibilities. (Doc. 33, pp. 25–26; doc. 24-2, pp. 25–26.) Seagraves also stated that she missed many things on her schedule, was unable to return phone calls, and was unable to attend meetings.[10] (Doc. 33, pp. 25–26; doc. 24-2, pp. 25–26.)

---

[10] Wagner notes repeatedly in her Response to the Hospital's Statement of Undisputed Material Facts, that Seagraves maintained responsibility for all of the admission notifications to the insurance payors. (<u>See, e.g.</u>, doc. 33, ¶¶ 15, 16, 21, 35 59, 65-68, 86; <u>see also</u> doc. 32-2, pp. 10–11.) Apparently, Wagner attempts to shift the responsibility for admission notifications to Seagraves to minimize the hardship endured by the Hospital when Seagraves has to perform Wagner's job. The Court is not persuaded. Wagner admits that Seagraves had her own demanding full-time job and that her primary role was not to perform Wagner's job. (Doc. 33, p. 13; doc. 24-3, pp. 16, 26–27, 43–44.) Indeed, Seagraves testified that "approximately 54 individuals . . . report to [her]," and that she is responsible for: (1) all of the discharge planning at the Hospital; (2) all of the clinical provisions of payors regarding beneficiaries; (3) discharge planning of beneficiaries; and (4) all of the areas that fall underneath discharge planning. (Doc. 32-2, pp. 10–11.) Wagner also concedes that, were the Hospital to have accommodated her request for seven days off, Seagraves would have to bear an additional workload, which would have taken her away from her own duties. (Doc. 33, p. 21; doc. 24-3, p. 45.) Therefore, to the extent Wagner argues that the fact that

Furthermore, Seagraves testified that Hardee, Patterson, and Woodward—all of whom assisted in performing Wagner's notifications during her four unexcused absences—complained about "the fact that [Wagner] was not at her job." (Doc. 33, pp. 25–26; doc. 32-2, pp. 46–48.)   Courts have found undue hardship in similar circumstances—i.e., where employees who do not share the plaintiff's religious beliefs must step in to perform the plaintiff's job at the expense of their own responsibilities.   See, e.g., Bruff v. N. Miss. Health Servs., Inc., 244 F.3d 495, 501 (5th Cir. 2001) ("Requiring one or both counselors to assume a disproportionate workload . . . is an undue hardship as a matter of law."); Telfair v. Fed. Exp. Corp., 934 F. Supp. 2d 1368, 1385 (S.D. Fla. 2013), aff'd, 567 F. App'x 681 (11th Cir. 2014) ("Any further accommodation on the part of FedEx would have been too costly, impractical or contrary to the FedEx seniority system," in part, because it would have "forc[ed] plaintiffs' co-workers to . . . bear the brunt of working the less attractive weekend shift assignments, or simply forc[ed] FedEx to 'do without' on Saturdays, causing it to suffer a significant loss in efficiency.").   Thus, the Court finds that, while there was no resulting financial harm to the Hospital, granting Wagner's request for seven days off would have imposed an undue hardship because Wagner's supervisors and coworkers would have had to take on a disproportionate workload, resulting in inefficiencies and interfering with their ability to perform their own responsibilities.

**B.     The Hospital's Undue Hardship Analysis was not "Purely Hypothetical" or too Speculative.**

Wagner next argues that the Hospital improperly "relie[d] on a purely hypothetical analysis to concoct the alleged undue hardships associated with granting Wagner's request to observe" the October High Holidays.  (Doc. 32, pp. 12–13.)   Several circuit courts of appeals

---

Seagraves bore "ultimate responsibility" for admission notifications precludes a finding of undue hardship, the Court disagrees.  See Hardison, 432 U.S. at 84 (rejecting plaintiff's contention that employer would not suffer undue hardship by replacing the plaintiff with supervisory personnel because doing so would have resulted in inefficiencies).

have recognized that an employer must prove more than a hypothetical hardship to justify the denial of a requested religious accommodation.  See, e.g., Hellinger, 67 F. Supp. 2d at 1365 (collecting circuit court cases).  For example, in Smith v. Pyro Mining Company, the Sixth Circuit Court of Appeals said that, although "[a]n employer may . . . establish undue hardship without actually putting an accommodation into effect," the employer still must "present evidence of undue hardship; it cannot rely merely on speculation."  827 F.2d 1081, 1086 (6th Cir. 1987).

The parties agree that once Seagraves learned that Wagner and Eichelbaum were each requesting seven workdays off between September 30 and October 22, 2019, Seagraves met with Woodward multiple times over a period of months to determine whether the Hospital could accommodate their requests.  (Doc. 33, pp. 19–20; doc. 24-2, pp. 33–34; doc. 24-3, pp. 34–35, 56, 59.)  Seagraves testified that she spent extra time and energy looking into the specific dates requested, including reviewing the Department's, Woodward's, and her own schedules.  (Doc. 33, p. 19; doc. 24-2, pp. 24, 37.)  Seagraves also indicated that she considered the anticipated workload, current staffing, her own and Woodward's full-time responsibilities, the number of days Wagner and Eichelbaum were requesting, and the fact that no one else possessed the skill set necessary to perform Wagner's job.  (Doc. 33, pp. 19–20; doc. 24-2, pp. 34–35.)  Based on these considerations, Seagraves and Woodward concluded that they could not alter their schedules to ensure they could perform the "vital function" of Wagner's duties for the seven days, nor could the Hospital afford the financial loss of failing to complete Wagner's duties. (Doc. 33, p. 20; doc. 24-2, pp. 25, 37.)  Additionally, Seagraves determined that granting both Eichelbaum and Wagner seven days off work would essentially require other employees to work two more full-time jobs.  (Doc. 33, pp. 20–21; doc. 24-2, pp. 24–25.)  Therefore, Seagraves

permitted Wagner and Eichelbaum to each use three PTO days each to observe the October High Holidays instead of seven days each.  (Doc. 33, pp. 20–21; doc. 24-2, p. 36.)

Notwithstanding these considerations, Wagner contends that the Hospital's undue hardship determination was the product of "unfounded speculation" and was not "based on fact or prior history."  (Doc. 32, pp. 2–3, 6.)  However, Wagner's own admissions belie her contention and indicate that, in actuality, her absence had proven to be problematic for the Department based on past attempts to accommodate her religious practices.  Specifically, Wagner admits that after she and Eichelbaum both used PTO to observe Jewish High Holidays in April 2019, "Seagraves realized [that] their simultaneous leave created a hardship on the Department."  (Doc. 33, p. 17; see doc. 24-2, pp. 19–20.)  Seagraves testified that this hardship prompted her to "put together a planning discussion to discuss Eichelbaum and Wagner's 2019 Jewish holidays."  (Doc. 33, p. 17; doc. 32-2, p. 40.)  Wagner also concedes that Seagraves decided she needed to discuss the Jewish holidays since—following the 2018 restructuring— there were now two people (i.e., Wagner and Eichelbaum) on a four-person team who requested the same days off to observe the Jewish holidays.  (Doc. 33, p. 17; doc. 24-2, pp. 19–20.)  Thus, unlike an employer who has never put a requested accommodation into practice, the Hospital stands on "stronger ground" because it "can point to [a] hardship[] that actually resulted" from previously allowing Wagner to use PTO to observe Jewish High Holidays after the Department was restructured.   Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 520 (6th Cir. 1975) (emphasis added); cf. E.E.O.C. v. JBS USA, LLC, 339 F. Supp. 3d 1135, 1183 (D. Colo. 2018) ("JBS's failure to adduce evidence of an actual, as opposed to a hypothetical, effect on productivity and safety from allowing unscheduled breaks for prayer in addition to restroom use, combined with JBS management's testimony that they were aware of no actual effects on

23

productivity or safety, supports a conclusion that there is no such impact or, at least, that any impact is de minimis.").

Next, Wagner argues that, "[w]hile [the Hospital] claims to have looked at the [D]epartment's anticipated workload and current staffing, [it] failed to look at any data in making the decision to deny Wagner's time off." (Doc. 32, p. 6.)  Specifically, Wagner argues that "Seagraves claims that in August 2019, a month before the start of Wagner's requested time off, . . . she projected the workload for October 2019 based upon 'historical data.'  However, in [her] deposition, Wagner conceded 'there was no data.'" (Id. at p. 13 (quoting doc. 32-2, pp. 64–65).)  According to Wagner, this shows that Seagraves "fabricated a reason to deny Plaintiff's religious accommodation."  (Id.)  The Court disagrees.  First, Wagner mischaracterizes Seagraves's testimony.  Wagner appears to suggest that Seagraves contradicted herself during her deposition by admitting she did not rely on data moments after stating she considered "historical data."  (See id.)  However, even viewing Seagraves' testimony in the light most favorable to Wagner, it is clear that Seagraves did not contradict herself; rather, she indicated that she relied on data in one context but not another.  Specifically, after Seagraves testified that "based on our current workload and staffing, granting seven days off . . . would impose an undue hardship on the [D]epartment," Wagner's counsel asked her whether she "[c]ould project the *current workload for October*."  (Doc. 32-2, p. 64 (emphasis added).)  Seagraves responded, "I can—based on historical data, I know what periods of time are going to look like with workload."  (Id.)  Shortly thereafter, Wagner's counsel asked Seagraves whether there was "a specific metric, a specific graph, a piece of data that she [looked at]" when "determining that . . . the workload *would be too great for [her] staff to handle*."  (Id. at p. 65 (emphasis added).)   To this question, Seagraves responded, "There was no data."  (Id.)  Thus, contrary to Wagner's suggestion that Seagraves contradicted herself, Seagraves clearly testified that she relied on

"historical data" to project the October workload, but that she did not rely on any "specific metric, . . . graph, [or] a piece of data" when evaluating whether the anticipated workload for October "would be too great for her staff to handle." (Id. at pp. 64–65.)

Additionally, Wagner fails to cite any authority for the proposition that an employer must utilize a "specific metric, . . . graph, [or] a piece of data" when evaluating whether a requested accommodation would cause undue hardship. Indeed, none of the cases cited by Wagner establish such a requirement. (See generally doc. 32, pp. 11–14 (listing cases).) To the contrary, they suggest that an employer is only required to provide evidence of an "actual imposition on co-workers or disruption of the work routine." E.E.O.C. v. Red Robin Gourmet Burgers, Inc., No. C04-1291JLR, 2005 WL 2090677, at *4 (W.D. Wash. Aug. 29, 2005) (quoting E.E.O.C. v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 615 (9th Cir. 1988)); see also, e.g., Hellinger, 67 F. Supp. at 1365 (citing Anderson v. Gen. Dynamics Convair Aerospace Div., 589 F.2d 397, 402 (9th Cir. 1978) approvingly for the holding that "undue hardship requires more than proof of co-worker's unhappiness with a particular accommodation; the defendant must show an actual imposition on co-workers or disruption of the work routine"). As noted in Discussion Section II.A., the Hospital has provided ample evidence that accommodating Wagner's request would have imposed (and ultimately did impose) upon Wagner's coworkers and supervisors and disrupted the Department's work routine. See Discussion Section II.A, supra. Furthermore, as discussed above, Wagner admits that Seagraves "realized [Wagner and Eichelbaum's] simultaneous leave created a hardship on the Department" following the April 2019 Jewish holidays, during which both Wagner and Eichelbaum simultaneously used PTO. (Doc. 33, p. 17.) Thus, because the evidence shows that Seagraves considered various criteria, including its past experience accommodating Wagner's religious observance, the Court rejects Wagner's

contention that the Hospital's finding of undue hardship was not based on precise data and thus speculative.

Finally, to the extent that Wagner argues that the Hospital's hardship determination is improper because Seagraves considered the possibility of employee illness, the Court disagrees. Wagner contends that "Seagraves added a whole new level of speculation to the equation" when she indicated that she considered the possibility that she or another employee could become ill while Wagner was absent for the October High Holidays.  (Doc. 32, p. 13 (quoting doc. 32-2, p. 65 ("What if we get sick? You know[,] there's no one to do the job; I'm going to have to be there no matter what working long hours, paying overtime.") (emphasis omitted).)  Even assuming (without deciding) that the risk of untimely employee illness, standing alone, is too speculative to support a finding of undue hardship, Wagner cites no authority (and the Court is aware of none) that suggests that an employer's hardship determination is invalidated merely because one of the factors it considered was speculative.  Indeed, the Court fails to see why Seagraves's statement, "What if we get sick?" should overshadow the other aspects of the Hospital's hardship analysis, such as considering the anticipated October workload, current staffing level, Seagraves's and Woodward's existing full-time responsibilities, the number of (overlapping) PTO days Wagner and Eichelbaum were each requesting, and Wagner's unique skill set.  (See doc. 33, pp. 19–20.)

Accordingly, the Court rejects Wagner's argument that the Hospital's undue hardship determination was too hypothetical or speculative to grant summary judgment in the Hospital's favor.

### C.   Alternate Shifts or Shift Swaps Would Not Have Alleviated the Undue Hardship Caused by Granting Wagner's Requested Accommodation

Wagner appears to argue that the Hospital could have mitigated any hardship by allowing her to work alternative shifts, including federal holidays (such as Christmas or Thanksgiving), or

to swap shifts with another employee.  (See doc. 32, p. 10.)   According to Wagner, "[she] was willing to work alternate shifts, as she had done in the past in order to save her PTO to utilize for the Jewish High . . . Holidays, [but] [the Hospital] refused to consider additional alternatives." (Id.)

The only evidence that Wagner offered to work an alternative shift so that she could observe the October High Holidays is a text she sent Seagraves on Sunday, October 13, 2019, to inform Seagraves (for the first time) that she would not be working on October 14 or 15.  (Doc. 33, p. 24; doc. 24-3, pp. 48–49; doc. 32-8, p. 2; see also doc. 32-1, pp. 137–38.)  Specifically, Wagner texted Seagraves, "I can come in today for a few hours."  (Doc. 32-8, p. 3.)  The Court doubts whether this eleventh hour offer was adequate, particularly in light of Wagner's concession that, up until that point, she had not complained or filed a grievance indicating her dissatisfaction with Seagraves's decision to grant her only three PTO days.  (Doc. 33, p. 23.) Regardless, Wagner neither argues nor provides any evidence to suggest that working for a few hours the Sunday before her October 14 shift would have alleviated the hardship of missing seven workdays over a seventeen-workday period.   Indeed, there is no evidence that, had Wagner worked for a few hours on October 13, Seagraves, Woodward, Hardee, or Patterson would no longer have had to perform her duties at the expense of their own.  To the contrary, as noted above, Wagner admits that "for [these individuals] to perform [her] job on th[e] seven workdays that [she] wanted to be off for the religious holiday[s]," (doc. 24-3, p. 45), they would have had "to bear an additional workload even though they already had demanding jobs," which "would have taken them away from the duties they were responsible for performing," (doc. 33, p. 21).  Thus, Wagner's offer to work an alternate shift is analogous to offers made by plaintiffs in other cases which were deemed insufficient to eliminate the hardship caused by a religious accommodation.   See, e.g., Dalberiste, 2020 LEXIS 28214, at *17 ("[R]egarding Plaintiff's

proposal that a third local or non-local employee be assigned to cover for him, GLE had no obligation to revamp the way it schedules and assigns its employees to accommodate Plaintiff, especially where there is evidence that the company's business efficiency would be affected."); see also Patterson v. Walgreen Co., 727 F. App'x 581, 588 (11th Cir. 2018) ("To ensure that [plaintiff] received the time off for Sabbath observance that he was insisting on, [the employer] would have had to schedule . . . shifts, including emergency ones, based solely on [plaintiff's] religious needs, at the expense of other employees who had nonreligious reasons for not working on weekends."); cf. Draper, 527 F.2d at 520 ("The record in this case certainly does not establish that accommodating Draper's religious practices would produce chaotic personnel problems. Indeed, there is little or no proof that the other employees would object at all.  Moreover, there is no requirement that a single employee be required to exchange shifts with Draper every Saturday.  Ideally, the substitution would be effected on a voluntary basis.  If not, the Company could rotate the assignment among several electricians so that the burden would not fall heavily upon any particular employee.").

Similarly, to the extent that Wagner argues the Hospital failed to consider a swap in shifts as an alternative, this argument fails.  (See doc. 32, p. 7.)  Wagner testified that she and Patterson occasionally "switched days."  (Doc. 32-1 p. 129.)  However, there is no evidence that Seagraves or any other Hospital employee was aware that this ever occurred or that Wagner offered to swap shifts with Patterson (or anyone else, for that matter) so that she could observe the October High Holidays.  Additionally, it is unclear to the Court—and Wagner fails to explain—how swapping shifts with another employee would have alleviated any hardship on the Department.  Wagner is the only employee who did insurance notifications full-time, and all other employees who could competently perform her job had their own full-time responsibilities.  (Doc. 33, pp. 3, 13; doc. 24-3, pp. 16, 21–26, 43.)  Wagner also testified that untrained persons should not perform

admission notifications.  (Doc. 33, p. 14; doc. 24-3, p. 41.)  Furthermore, although Patterson worked on mother/baby notifications part-time, she had her own separate duties.  (Doc. 33, p. 8; doc. 24-3, pp. 13–14, 42.)  Moreover, Seagraves testified that mother/baby notifications were a "very small portion of . . . Wagner's job" and that Patterson "was never oriented" to the "medical notifications" for which Wagner was responsible.  (Doc. 32-2, p. 15.)  Thus, allowing Wagner and Patterson to switch shifts would, essentially, have required the Hospital to replace Wagner with an employee who had her own separate responsibilities and who did not know how to do the bulk of Wagner's job.  Courts have found this sort of swap to pose an undue hardship.  See, e.g., Berry v. Meadwestvaco Packaging Sys., LLC, No. 3:10cv78–WHA–WC, 2011 WL 867218, at *7 (M.D. Ala. Mar. 14, 2011) ("When an employer is required to replace a trained worker with an untrained one, and the employer presents evidence that this replacement will cause inefficiencies and product quality problems, that is more than a de minimis cost."); E.E.O.C. v. BJ Servs. Co., 921 F. Supp. 1509, 1514 (N.D. Tex. 1995) (finding that replacing plaintiff with untrained personnel would have caused undue hardship in light of testimony that the replacement could have created inefficiencies or decreased production); Brener v. Diagnostic Ctr. Hosp., 671 F.2d 141, 146–47 (5th Cir. 1982) ("Brener's principal proposal, that Luther direct other employees to trade shifts with him, also would inflict undue hardship upon the hospital and its employees.  Luther's experiment with this solution resulted in disruption of work routines and a lowering of morale among the other pharmacists.  . . .  The hospital is also harmed because its employees are compelled to accept less favorable working conditions."); cf. Kilpatrick v. Hyundai Motor Mfg. Ala., LLC, 911 F. Supp. 2d 1211, 1218–20 (M.D. Ala. 2012) (finding that employer failed to show that allowing an employee who was uniquely skilled in glass repair to voluntarily swap shifts created undue hardship where there were four to six other glass repairers on each shift who could competently perform the plaintiff's tasks).  Thus, the Court finds that a

shift swap between Wagner and Patterson (or another employee who had his or her own separate duties) would not have alleviated the hardship caused by Wagner's requested accommodation.

In sum, in light of the forgoing, the Court finds that the Hospital has met its burden of proving it could not have allowed Wagner to miss seven days of work to observe the October High Holidays without enduring undue hardship in the conduct of its business.  Therefore, summary judgment with respect to the failure to accommodate claim in Count I must be granted.

## CONCLUSION

Based on the forgoing, the Court **DISMISSES** Plaintiff's Opposed Motion for Deferment, (doc. 28), and **GRANTS** Defendant St. Joseph's/Candler Health System, Inc.'s Motion for Summary Judgment as to all claims against it, (doc. 24).  Accordingly, the Court **DISMISSES** all claims asserted against Defendants in the Complaint and **DIRECTS** the Clerk of Court to **ENTER** the appropriate judgment closing this case.

**SO ORDERED** this 28th day of March, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA